764 A.2d 351

**John R. WILLIAMS**

v.

**MARYLAND DEPARTMENT OF HUMAN RESOURCES, et al.**

**No. 3052, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

Dec. 28, 2000.

154

James C. Strouse, Columbia, for appellant.

Elise Song Kurlander, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on the brief), Baltimore, for appellees.

Argued before BYRNES, ADKINS and MARVIN H. SMITH (Retired, Specially Assigned), JJ.

ADKINS, Judge.

John R. Williams, appellant, sued his former employer after it promoted a woman instead of appellant. He asserted sex discrimination, age discrimination, constructive discharge, and breach of contract claims against the State of Maryland Department of Human Resources (the "Department"), and Bert Finklestein, who was then Inspector General of the Department (collectively "appellees"). The Circuit Court for Anne Arundel County granted summary judgment in favor of appellees on all counts. On appeal, appellant raises the following issues, which we have rephrased.

I. Did the trial court err in granting summary judgment on the sex discrimination claim?

II. Did the trial court err in granting summary judgment on the age discrimination claim?

III. Did the trial court err in granting summary judgment on the constructive discharge claim on the grounds that appellant failed to comply with the Maryland Tort Claims Act?

IV. Did the trial court err in granting summary judgment on the breach of contract claim?

We shall affirm the judgments on all counts except for the sex discrimination claim. Because there was sufficient direct evidence that gender bias affected the employment decision, we shall reverse the judgment on that count, and remand for further proceedings.

## FACTS AND LEGAL PROCEEDINGS

The Department hired appellant in May 1985. Eventually, appellant became a Fiscal Specialist II. This job involved "prevent[ing], detect[ing] and eliminat[ing] fraud, waste, mismanagement and corruption within the Department...." In late 1993, the Department announced that it was creating a new Fiscal Specialist III position "to serve as an auditor-in-charge." According to Finklestein, the new position did not require supervisory experience.

Eleven employees from the Department initially expressed interest in the position. In an affidavit, Finklestein stated that he informally interviewed each of the eleven candidates, and then selected three of them as finalists. Appellant was not chosen as a finalist. Two of the three finalists were male and the other, Linda Heaton, was female. Each of the finalists was interviewed individually by a panel consisting of Finklestein and three other supervisors. In April 1994, the panel selected Heaton for the position.

Finklestein stated in his affidavit that he did not choose appellant as a finalist because his "[i]nterview was not as good as [the three] top candidates [and his] [a]bility to interact at [the] supervisory level [was] questionable." During discovery, appellees produced memoranda detailing problems relating to appellant. After being passed over for the promotion, in January 1995, appellant was referred to the Employee Assistance Program ("EAP")[1] because of his inability to follow directions.

---

1. The EAP is a counseling program that was established "to assist in retaining valuable employees experiencing personal problems that adversely affect their job performance."

On March 26, 1998, appellant filed a complaint in the circuit court based on his failure to gain the promotion. After a hearing on appellees' motion for summary judgment, the circuit court granted summary judgment on all claims against Finklestein, and on all claims against the Department except the sex discrimination count. After discovery, the Department renewed its motion on the sex discrimination count. The court granted the motion. This appeal followed.

Additional facts will be added as necessary to the following discussion.

## DISCUSSION

Appellant contends that the trial court erred in granting summary judgment on all counts of appellant's complaint. Accordingly, we shall address each count separately.

## I.

### Standard Of Review

Summary judgment is appropriate where there is no dispute of material fact and the moving party is entitled to judgment as a matter of law. Md. Rule 2–501. In reviewing the grant of a motion for summary judgment, we review the trial court's ruling as a matter of law. *See Fearnow v. Chesapeake & Potomac Tel. Co.,* 104 Md.App. 1, 48, 655 A.2d 1, *rev'd in part on other grounds,* 342 Md. 363, 676 A.2d 65 (1996) (1995). Additionally, we review the same information from the record and decide the same issues of law as the trial court. *See Heat & Power Corp. v. Air Prods. & Chems., Inc.,* 320 Md. 584, 591–92, 578 A.2d 1202 (1990).

## II.

### Discrimination Claims

#### A.

### Sex Discrimination Claim

Appellant contends that the trial court erred in granting appellees summary judgment on his sex discrimination claim

under Title VII. *See* 42 U.S.C. § 2000e–2(a)(1). According to appellant, "the evidence of record establishes at the very least a question of fact on each and every element necessary to establish a prima facie case of discrimination under Title VII." In his brief, he points to the following evidence of gender discrimination that he contends raised sufficient factual disputes to require denial of summary judgment: (1) testimony by a Department supervisor that others in the Department, including a member of the panel that selected Heaton, stated that a female had to be selected for the position; (2) evidence that he was more qualified than Heaton; and (3) evidence that the Department failed to follow its own rules and procedures in the promotion process.

In the pretrial context of a motion for summary judgment, there are significant differences in the analytical framework and proof burdens depending on whether the employee's evidence of discrimination is "direct" or "circumstantial" evidence. These differences frame our review of this claim. For this reason, we first summarize the applicable law, and then proceed to consider whether appellant's evidence was sufficient to raise a material dispute of fact preventing summary judgment on his sex discrimination claim.

## 1.

### Analytical Framework And Evidentiary Burdens

An employee may prove that gender played a part in an employer's decision not to promote the employee by using either direct evidence or circumstantial evidence. In this case, appellant has advanced both a direct evidence theory and a circumstantial evidence theory as grounds for reversal. Accordingly, we shall review the nature of these alternative theories.

 "Evidence is 'direct' . . . when it consists of statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision." *Febres v. Challenger Caribbean Corp.*, 214 F.3d 57, 60 (1st Cir.2000); *see also Taylor v. Virginia Union Univ.*, 193

F.3d 219, 232 (4th Cir.1999) (en banc), *cert. denied,* 528 U.S. 1189, 120 S.Ct. 1243, 146 L.Ed.2d 101 (2000). Generally, direct evidence is sufficient to establish a prima facie case of "mixed motive" discrimination. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 250, 109 S.Ct. 1775, 1791, 104 L.Ed.2d 268 (1989). "Once there is credible direct evidence, the burden of persuasion shifts to the defendant to show that it would have [made the same employment decision] had it not been motivated by discrimination." *Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.,* 176 F.3d 921, 926 (6th Cir.1999). "In saying that gender played a motivating part in an employment decision, we mean that, if we asked the employer at the moment of the decision what its reasons were and if we received a truthful response, one of those reasons would be that the applicant or employee was a woman." *Price Waterhouse,* 490 U.S. at 250, 109 S.Ct. at 1790. The combination of gender and non-discriminatory reasons create the "mixed motive."

■ Circumstantial evidence will support a discrimination case when it meets the test set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[2] This test involves proving a prima facie case of discrimination, which shifts to the employer the burden of offering a non-discriminatory reason for the contested employment decision. If the employer meets this burden, the employee must show that the employer's stated reason for the

---

**2.** In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court set out the prima facie elements of a discrimination case, requiring a plaintiff to prove: "(i) that he belongs to a [protected] minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of [plaintiff's] qualifications." *Id.* at 802, 93 S.Ct. at 1824. In failure to promote cases, the test is stated in a slightly different manner. Instead of proving that the position remained open after the plaintiff's termination, a plaintiff must prove that the "plaintiff was rejected for the position under circumstances giving rise to an inference of unlawful discrimination." *McNairn v. Sullivan,* 929 F.2d 974, 977 (4th Cir.1991).

decision was a pretext for discrimination. The employee may meet this burden with evidence tending to show that the assigned reason was false, and in this manner use circumstantial evidence to prove that discrimination occurred. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, ——, 120 S.Ct. 2097, 2104, 147 L.Ed.2d 105 (2000).

 Generally, mixed motive cases based on direct evidence of discrimination are more likely to survive summary judgment than pretext cases, which are discrimination cases that are based on circumstantial evidence. As the First Circuit recently recognized, there are significant advantages for an employee who can present sufficient direct evidence of discrimination to establish a mixed motive case.

A plaintiff alleging disparate treatment ... usually proceeds by means of the familiar framework engendered in *McDonnell Douglas Corp. v. Green*, .... [T]his approach [is] customarily called the "pretext" approach.... What is significant ... is that, under pretext analysis, the burden of persuasion remains with the plaintiff throughout the case.

In some situations, however, a plaintiff may be entitled to use an approach that relieves her of this unremitting burden of persuasion. The key that unlocks this door is the existence of direct evidence that a proscribed factor (such as age, gender, race, or national origin) played a motivating part in the disputed employment decision. *See Price Waterhouse.* Such evidence, if accepted by the factfinder, shifts the burden of persuasion to the employer, who then must establish that he would have reached the same decision regarding the plaintiff even if he had not taken the proscribed factor into account. Although the plaintiff's initial burden under this "mixed-motive" approach is heavier than the de minimis showing required to establish a prima facie case under the pretext approach, most plaintiffs perceive the *Price Waterhouse* framework and its concomitant burden-shifting as conferring a pronounced advantage. In

the average case, the employee thirsts for access to it, while the employer regards it as an anathema.

*Febres,* 214 F.3d at 59.

■ Summary judgment is less likely in a mixed motive case because the employer bears the burden of convincing the fact finder that its motives, intent, and action were not tainted by discrimination. Like other motive and intent issues generally, an employer's "we would have done the same thing" defense to a mixed motive case of discrimination is ill-suited for resolution on summary judgment. The employer's evidence of its intent must be weighed against the direct evidence of discrimination offered by the employee. Because "credibility determinations in respect to direct evidence [of discrimination] are for a properly instructed jury, not for the judge," *id.* at 61 n. 3, the employer frequently may not obtain summary judgment once the employee has offered credible direct evidence of discrimination. *See, e.g., Laderach v. U–Haul,* 207 F.3d 825, 828 (6th Cir.2000) (reversing summary judgment based on plaintiff's direct evidence of discrimination).

■ In contrast, in a pretext case based on circumstantial evidence of discrimination, summary judgment may be predicated on an employee's failure to satisfy the burden of production that it bears at two of three stages under the *McDonnell Douglas* model. If the employee fails to offer sufficient evidence to dispute the employer's reason, summary judgment is appropriate. In *Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the Supreme Court recently clarified this burden, holding that "[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the [employer's] explanation that the employer is dissembling to cover up a discriminatory purpose." *Id.* at ——, 120 S.Ct. at 2108. In doing so, the *Reeves* Court recognized that, to establish a prima facie case of discrimination, circumstantial evidence is generally not sufficient, by itself, to defeat an employer's motion for summary judgment in a pretext case.

## B.

## Direct Evidence Of Sex Discrimination:
## "A Lady Had To Be Selected"

Appellant offered the testimony of his immediate supervisor, John Belt, as direct evidence that the Department discriminated against him because he is male. Belt testified at his deposition that during the selection process, "[t]here was talk that a lady had to be selected for that position." Apx81. He also testified that one of the persons who engaged in such "talk" was Harry Burns, the Department's Director of Audits. Burns served with Finklestein on the panel that interviewed the three finalists and ultimately selected Heaton. These statements led Belt to believe that the position was not truly open to any of the male candidates.

Q: Do you believe that Mr. Williams was not chosen because he was a man?

A: I believe that.

Q: Would it surprise you to know there were 2 other men who were in contention for the job?

A: I don't know.

Q: Why do you believe that?

A: There were certain talks around the office, there were certain statements and all which indicated that Linda Heaton was a frontrunner . . . for the supervisory position, and it appeared because she was a female she had been selected. We had no females in a . . . supervisory or managerial position within the audit unit.

Q: There was some talk, some discussion. Who was doing the talking and who was doing the discussing?

A: We had discussions. It wasn't a formal discussion or what have you. There was talk that a lady had to be selected for that position. . . .

Q: [D]o you recall if that was discussion among some of the auditors in the place or do you recall who may have made that statement?

A: I believe Mr. Burns made that statement. He said we had to select a female. Additionally right after I was supervising Linda Heaton at a Prince George's County audit, and we were going out to the exit conference and Mr. Burns stated that we are fairly represented because we have a Jew, who was Bert Finklestein, we have a black, who was me, we have a female who is Linda Heaton, and we have a[c]aucasian who was Harry Burns so those types of remarks were made quite frequently. . . .

Q: Now just so I am clear on all of that, Mr. Burns is the individual you recall having made that comment that a woman had to be selected for this position?

A: Yes.[3]

Appellant argues that Belt's testimony about Burns' statement is "direct evidence of bias and discrimination in the decision making process of an employer [that] indicates [the Department's] stated reasons for a decision are pretextual and requires that the employee's discrimination claim be submitted to a fact finder." Appellees counter that at best, Burns' alleged statement was merely an inadmissible "stray remark" that cannot be attributed to them because Burns was not involved in the decision not to promote appellant.

As we have discussed, direct evidence of a defendant's discriminatory animus may be sufficient to raise a factual dispute as to whether the employer's decision was motivated by both legitimate and discriminatory reasons. *See, e.g., Laderach,* 207 F.3d at 829–30 (reversing summary judgment for employer based on finding that fellow employee's unrefuted testimony that supervisor stated that he would not promote plaintiff because she was a woman was sufficient direct evi-

---

3. We note that Belt's deposition testimony contradicts his earlier affidavit, in which he stated that Finklestein made the alleged statement. When asked about the discrepancy, Belt confirmed that "[i]t was Harry Burns," and stated that the affidavit was not accurate, perhaps due to "a typo error." Of course, neither we nor the trial court may resolve the conflict, or make any credibility determinations regarding this testimony. That is a job for the fact finder. *See Pittman v. Atlantic Realty Co.,* 359 Md. 513, 537, 754 A.2d 1030 (2000).

dence of discriminatory animus to raise factual dispute). The issue raised in this case is whether Burns' alleged statement constituted direct evidence of discrimination.

In *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), the Supreme Court addressed when statements made by a supervisor will support a mixed motive sex discrimination claim. In *Price Waterhouse,* a female employee supported her claim that she had been denied admittance into a partnership because of her gender with evidence that male partners made sexist comments in evaluating her candidacy.

> One partner described her as 'macho;' another suggested that she 'overcompensated for being a woman;' a third advised her to take 'a course at charm school.' Several partners criticized her use of profanity; in response, one partner suggested that those partners objected to her swearing only 'because it's a lady using foul language.'

*Id.* at 235, 109 S.Ct. at 1782. The Court held that remarks such as these will support a plaintiff's claim for sex discrimination because the comments support the conclusion that the decision not to admit the plaintiff to the partnership was based on "stereotypical notions about women's proper deportment." *Id.* at 256, 109 S.Ct. at 1794. The court cautioned, however, that not every remark made in the workplace will support a claim for sex discrimination. Writing for a plurality of the court, Justice Brennan explained:

> Remarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision. The plaintiff must show that the employer actually relied on her gender in making its decision. In making this showing, stereotyped remarks can certainly be *evidence* that gender played a part.

*Id.* at 251, 109 S.Ct. at 1791.

Several federal cases have addressed the circumstances when remarks by supervisors constitute direct evidence of unlawful discrimination. In *Emmel v. Coca–Cola Bottling Co.,* 95 F.3d 627 (7th Cir.1996), the plaintiff contended that she was

the victim of unlawful sex discrimination based on her being bypassed for several upper-management positions. In support of her position, the employee presented evidence that she had a longer career with the employer than the employees chosen for promotion, and that only men were promoted. Further, she presented evidence that a supervisor told her that she was "the only other one qualified" for the promotion and that "you know, as we all know, they wanted men in these positions in the past...." *Id.* at 631. She "also introduced evidence of a number of statements by the top officers at [the employer] indicating a corporate bias against women holding upper-management positions." *Id.* at 632.

The Seventh Circuit upheld a jury verdict in favor of the employee, explaining that

the statements in question are more than just stray comments.... They are from the top policymakers in the company, the owner, president, vice president and two regional vice presidents, who are ultimately responsible for the company's employment practices. They directly address the policy at issue, the employment of women in upper-management positions at the company.... The jury could readily conclude that the statements demonstrated a pervasive attitude that women do not belong in the upper echelons at [the employer].

*Id.* at 632.

A similar result was reached in *EEOC v. Alton Packaging Corp.*, 901 F.2d 920 (11th Cir.1990). In *Alton*, an employee, who had worked for the employer for a number of years, filed a race discrimination claim against his employer. At trial, one witness testified that the general manager of the plant had stated "if it was his company, he wouldn't hire any black people." *Id.* at 922. The Eleventh Circuit held this evidence was sufficient to support a claim of race discrimination because the general manager "was a decision maker, and he made the remark in reference to hiring." *Id.* at 924.

Although discriminatory remarks are particularly probative if they are made by the ultimate decisionmaker with

respect to the contested employment action, direct evidence of discriminatory statements and actions by someone other than the decisionmaker also may be sufficient to raise a factual dispute. Courts have imputed the bias of an inferior employee to an ultimate decisionmaker when the inferior employee has had an opportunity to influence either the contested employment decision or the decisionmaker's assessment of the employee. *See Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1459 (7th Cir.1994). "Summary judgment generally is improper where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action." *Id.* at 1459. In *Dey*, the Seventh Circuit held that evidence that an employee who expressed a discriminatory animus toward the plaintiff also gave an unflattering assessment of the plaintiff's job performance to the person who ultimately made the contested employment decision, was sufficient to establish that the lower level employee was part of the employer's decision-making team. The appellate court reversed the trial court's grant of summary judgment in favor of the employer. *See id.* (general counsel who sexually harassed employee, then gave an unfavorable performance report to the general manager, who terminated her, participated in that termination decision).

In this case, appellees assert that they were entitled to summary judgment because Finklestein, not Burns, was the decisionmaker, and because two of the three finalists were male, thus "proving" that appellant's gender was not a reason for his exclusion.[4] We disagree with both contentions, and hold that Burns' alleged statement that "a lady needed to be selected" qualifies as direct evidence of a discriminatory intent

---

4. We note that the Department has not asserted that the Fiscal Specialist III selection process was subject to an applicable, constitutionally permissible affirmative action policy designed to eliminate agency work force imbalances on a case by case basis. *Cf. Johnson v. Transportation Agency of Santa Clara County*, 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987) (agency may take into account candidate's gender as one factor in determining a promotion, if its affirmative action policy comports with constitutional requirements).

with regard to the contested employment decision. We explain.

First, we cannot say as a matter of law that Burns had no role in the decision not to promote appellant. The record shows that Burns participated in the ultimate decision to select Heaton, as a member of the panel that interviewed and chose her. Under the circumstances, Burns was sufficiently close to the decisionmaking process to be a participant in it, and to allow the inference that his viewpoint represented that of the Department's management. Moreover, the statement he is alleged to have made related directly to gender and to the specific employment decision at issue. Thus, it was not merely a "stray remark."

The evidence that Finklestein made the decision not to select appellant as a finalist or that two other men were included in the three finalists does not require a different conclusion, as appellees contend. Belt's testimony regarding Burns' statement can be construed as direct evidence that from the outset, the Department decided to select a woman for the position. Burns' statement that "a lady had to be selected" may be considered by the fact finder as an admission that the two-step selection procedure was merely Departmental "window dressing" for a decision that had already been made. Thus, Belt's testimony was direct evidence that Heaton had already been pre-selected because she was female.

We disagree with the trial court's conclusion that Belt's testimony regarding Burns' alleged statement was hearsay. Burns' participation in the selection process and his status as a member of the Department's management team removes his statement from the category of inadmissible hearsay. His statement regarding the gender qualifications for the position is an admissible statement by a party-opponent in a representative capacity, under Maryland Rule 5–803(a)(1). *See, e.g., B & K Rentals & Sales Co. v. Universal Leaf Tobacco Co.*, 324 Md. 147, 157–58, 596 A.2d 640 (1991) ("[s]tatements by agents concerning a matter within the scope of the agent's employment and made during the existence of

the agency relationship should be admissible without the necessity of proving that the agent had authority to speak or that the statements were part of the *res gestae* ").

If the fact finder ultimately believes Belt's testimony, appellees must prove by a preponderance of the evidence that they would have reached the same decision in the absence of discrimination. *See Price Waterhouse,* 490 U.S. at 242, 109 S.Ct. at 1786. Because we cannot summarily discount or credit Belt's testimony about Burn's statement at this stage of the proceeding, we shall reverse judgment on this claim, and remand for further proceedings.

### 2.

### Circumstantial Evidence Of Sex Discrimination: Qualifications And Tests

■ In addition to Belt's testimony, appellant also relies on circumstantial evidence of discrimination. Specifically, he contends that there was sufficient evidence that he was more qualified than Heaton, and that the Department failed to follow its own rules and procedures in the promotion process, to establish that appellees' reasons for not promoting him were pretextual under the *McDonnell Douglas* framework.

■ Because appellant's sex discrimination claim survives as a mixed motive case on the strength of Belt's testimony, we need not decide these contentions. Circumstantial evidence of discrimination is admissible in a mixed motive case to corroborate the direct evidence of discrimination. *See, e.g., Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1187 (2d Cir.1992) (plaintiff may utilize both direct and circumstantial evidence to prove that employment decision was motivated by discriminatory factors); *Levy v. Comm'n on Human Rights,* 236 Conn. 96, 671 A.2d 349, 356 n. 16 (1996) (same). Thus, appellant is free to offer evidence regarding appellant's qualifications and applicable Departmental rules and procedures on the issue of whether appellees would have made the same decision regardless of appellant's gender.

■ We note, however, that this evidence, by itself, would not be sufficient to establish appellant's claim. Appellees have articulated a legitimate nondiscriminatory reason for their decision, by offering evidence that Heaton was chosen for the position because of her strong interview and that appellant was not selected as a finalist because his interview was not as strong as the three finalists, and because his ability to interact at a supervisory level was questionable. Appellant's proffer of his qualifications for the position does not discredit appellees' asserted reasons for not selecting him. Indeed, employers are not required to choose the most qualified person for a promotion. *See Emmel,* 95 F.3d at 633; *see also Causey v. Balog,* 929 F.Supp. 900, 910 (D.Md.1996) ("courts are not to impose their own judgments for nondiscriminatory employer decisions").

■ Moreover, a disgruntled employee's self-serving statements about his qualifications and abilities generally are insufficient to raise a question of fact about an employer's honest assessment of that ability. *See Dey,* 28 F.3d at 1460. Similarly, courts give little weight to corroborating statements by co-workers or supervisors. *See id.* The reason is that such evidence "does not shed any light on whether the employer honestly based its employment decision on performance-related considerations, which is the focus of [the] inquiry...." *Id.* Only evidence that goes beyond generalized assertions to directly address the specific performance deficiencies identified by the employer is sufficient to dispute the employer's asserted reasons. *See id.* at 1460–61.

■ Nor does appellant's complaint that "unlike [appellant], Heaton had not taken the statewide test and had not been certified as eligible for the position by State authorities" necessarily undermine appellees' asserted reasons for passing over appellant. It is undisputed that appellant was number eight on the Department's eligible list and that Heaton was not on the list. But appellant's reliance on COMAR

06.01.01.32A [5], which provides that "[t]he appointing authority shall select the person or persons to be appointed from those whose names were certified by the Secretary," is misplaced. We agree with appellees that COMAR 06.01.01.32 does not apply, because the new position was a "reclassification," which does not require the use of the eligibility list under COMAR 06.01.01.13C.(2).[6] The Fiscal Specialist III position was created "[a]s part of audit regionalization" and did not exist at the time the job announcement was made. Moreover, it is clear from the record that the new position was to be filled by a person who was already in the department. COMAR 06.01.01.32–2 addresses promotions. It provides:

An appointing authority may fill a vacancy by selection of promotional candidates from any certification of eligibles list in the following manner:

A. An appointing authority shall select any one of the first five available promotional candidates certified in accordance with § B.

B. An appointing authority may select from a list consisting of:

(1) Employees of the appointing authority; or

(2) Other employees within the same principal department as the appointing authority; or

(3) All other employees certified as promotional.

Under this section, the appointing authority has discretion whether to use the eligibility list in promotional decisions. The regulation unambiguously states that the appointing authority *may* select from an eligibility list, but also gives the

---

**5.** The regulations contained in COMAR part 6 have since been repealed and restated in part 17.

**6.** COMAR 06.01.01.13C.(2) provides:

An appointing authority may promote from within an organizational unit a qualified candidate who is the incumbent in a position that is reclassified without requiring that the qualified candidate be on an eligible list for the particular classification, provided pertinent documentation is retained.

appointing authority the option of selecting an employee "within the same principal department as the appointing authority." In the instant case, the appointing authority advertised the position in the Department and compiled a list from those interested. This manner of promotion was authorized under COMAR 06.01.01.32–2 B.(2).

## B.

### Age Discrimination Claim

Appellant also appeals the judgment entered on his age discrimination claim. In his brief, he argues that Finklestein discriminated against him because his "seniority, long experience in the field, and broad competence was a threat to the advancement of Finklestein's career."

We shall affirm summary judgment on this count of the complaint because appellant abandoned his claim for age discrimination during the summary judgment hearing.

THE COURT: So your position is you agree with [appellees' counsel] that I should grant [appellees'] motion with regard to age.

[APPELLANT'S COUNSEL]: Yes, Your Honor.

[THE COURT]: Okay, then we will grant it as to age. . . .

Maryland law is well settled that " '[t]he right to appeal may be lost by acquiescence in, or recognition of, the validity of the decision below from which the appeal is taken or by otherwise taking a position which is inconsistent with the right of appeal.' " *Osztreicher v. Juanteguy*, 338 Md. 528, 534, 659 A.2d 1278 (1995) (quoting *Rocks v. Brosius*, 241 Md. 612, 630, 217 A.2d 531 (1966)). Appellant's assertion on appeal is inconsistent with his acquiescence to summary judgment on the age discrimination claim before the circuit court. We hold, therefore, that appellant may not challenge the grant of summary judgment on the age discrimination claim.

## III.

### Other Claims

### A.

### Constructive Discharge Claim

Appellant contends that the circuit court erred in dismissing his constructive discharge claim against the Department. We agree with appellees that appellant's failure to follow Md.Code (1984, 1999 Repl.Vol.), section 12–106 of the State Government Article ("SG"), bars his constructive discharge claim, and explain.

The State of Maryland has waived its immunity in tort actions provided certain procedures are followed. *See* SG § 12–104(a). SG section 12–106(b) provides, in pertinent part:

(b) *Claim and denial required.*—A claimant may not institute an action under this subtitle unless:

(1) the claimant submits a written claim to the Treasurer or a designee of the Treasurer within 1 year after the injury to person or property that is the basis of the claim;

(2) the Treasurer or designee denies the claim finally[.]

The purpose of this notice requirement is to give the State notice of claims against it. *See Johnson v. State,* 331 Md. 285, 296, 628 A.2d 162 (1993). "That early notice, in turn, affords the State the opportunity to investigate the claims while the facts are fresh and memories vivid, and, where appropriate, settle them at the earliest possible time." *Haupt v. State,* 340 Md. 462, 470, 667 A.2d 179 (1995). The notice requirement is mandatory, so that failure to provide the requisite notice bars any suit against the State. *See Rivera v. Prince George's County Health Dept.,* 102 Md.App. 456, 469, 649 A.2d 1212 (1994), *cert. denied,* 338 Md. 117, 656 A.2d 772 (1995). The bar applies "even though the State may have suffered no prejudice from the plaintiff's failure to comply with the requirement." *Johnson,* 331 Md. at 291, 628 A.2d 162.

In his complaint, appellant alleges that his injuries occurred in 1994 when he was denied promotion in favor of

Heaton, and in 1995 when he was reassigned and referred to the EAP. Appellant filed suit on March 26, 1998. According to an uncontrovered affidavit submitted by J. Vincent McCann, "the designee of the State Treasurer for purposes of the Maryland Tort Claims Act," appellant has never filed notice of a claim with the Treasurer's office. Therefore, appellant's constructive discharge count is barred against the Department because he failed to comply with SG section 12–106(b).

Even if appellant had provided the requisite notice, he has not provided sufficient facts to support his claim for constructive discharge. "[A] constructive discharge occurs ... when an employer deliberately causes or allows the employee's working conditions to become 'so intolerable' that the employee is forced into an involuntary resignation." *Beye v. Bureau of Nat'l Affairs,* 59 Md.App. 642, 650, 477 A.2d 1197, *cert. denied,* 301 Md. 639, 484 A.2d 274 (1984). Maryland courts have applied an objective standard in determining whether an employee was constructively discharged. " 'The applicable standard to determine if the resignation is, in effect, a constructive discharge, is whether the employer has deliberately caused or allowed the employee's working conditions to become so intolerable that a reasonable person in the employee's place would have felt compelled to resign.' " *Moniodis v. Cook,* 64 Md.App. 1, 11, 494 A.2d 212 (1985) (quoting *Beye,* 59 Md.App. at 653, 477 A.2d 1197). For example, in *Moniodis,* certain employees refused to take a polygraph examination. In response, the employer "impose[d] such hour and location conditions as would make continued employment simply fruitless for those who refused polygraphs." *Id.* at 11, 494 A.2d 212. Moreover, evidence was presented that a supervisor stated that "what I want to do is cut her hours back until there is no longer any value for her to work here. She will become frustrated." *Id.* We held that this evidence was sufficient to support a claim for constructive discharge because the employer imposed measures "as would reasonably ensure its goal [of terminating the employees] was achieved." *Id.* at 12, 494 A.2d 212. *See also Staggs v. Blue Cross of*

*Maryland, Inc.,* 61 Md.App. 381, 392–93, 486 A.2d 798 (1985) (holding that plaintiffs' allegation that they were induced to resign under threat of discharge presented a factual issue inappropriate for resolution by summary discharge).

 In support of his claim of constructive discharge, appellant contends that "Finklestein waged a campaign of harassment against [appellant]; he maliciously stated untruths about [appellant]; he placed memoranda in [appellant's] personnel file that were untrue (concerning the mileage request and the Charles County audit); he maliciously sent [appellant] to the Department's EAP program to show that [appellant] had problems in the workplace." Appellant, however, never resigned. The evidence indicates that his position was abolished based on budget constraints. Therefore, because he did not resign, he cannot complain that his working conditions were so intolerable that he felt reasonably compelled to resign. For these reasons, we hold that the trial court properly granted appellees summary judgment on appellant's constructive discharge claim.

## B.

### Breach Of Contract Claim

Lastly, appellant contends that the circuit court erred in dismissing his breach of contract claim. According to appellant, "Finklestein's and Burns' numerous and continuous acts of harassment against [appellant] constitutes constructive discharge and constitutes a direct violation of the grievance procedures that were part of [appellant's] contract rights and obligations." We find appellant's contention without merit.

Appellant's complaints regarding a breach of contract are identical to his claims of constructive discharge.[7] As discussed *supra,* appellant never resigned from his position; therefore,

---

7. In his brief, appellant styles his argument for breach of contract as "[t]he prima facie case of breach of contract due to constructive discharge."

he cannot contend that his employment conditions were so intolerable that he felt reasonably compelled to resign.

Moreover, appellant has not presented any evidence that he had a contract with the Department. Rather, he contends that the violation of certain regulations amounted to a breach of contract. Appellant cites only one statute to support his position, Md.Code (1993, 1997 Repl.Vol.), § 12–109 of the State Personnel and Pensions Article, which provides that "[e]ach party to a grievance shall make every effort to resolve the grievance at the lowest level possible." [8] Appellant contends that any grievance should have been handled by his immediate supervisor, Belt.

■■■ Section 12–109 does not provide appellant with contractual rights. The statute simply states the general policy consideration that grievances are to be handled at the lowest level possible. The statute does "not promise appellant, or any of [the Department's] other employees, any specific and definite benefit." *MacGill v. Blue Cross of Maryland, Inc.,* 77 Md.App. 613, 619, 551 A.2d 501 (1989). They are no more than " 'general statements of policy,' which do not, and indeed could not, 'meet the contractual requirements for an offer.' " *Id.* at 620, 551 A.2d 501. For this reason, the trial court did not err in dismissing appellant's breach of contract claim.

**JUDGMENT REVERSED AS TO COUNT I OF THE COMPLAINT, AFFIRMED AS TO ALL OTHER COUNTS. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID ONE HALF BY APPELLANT AND ONE HALF BY APPELLEES.**

---

8. We note that appellant incorrectly identified this statute as section 12–201 of the State Personnel and Pensions Article.